UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

J&J FISH ON CENTER STREET, INC.,

     Plaintiff,

 v.

CRUM & FORSTER SPECIALTY      Case No. 20-cv-1644-bhl
INSURANCE COMPANY,

     Defendant.

CRUM & FORSTER SPECIALTY
INSURANCE COMPANY,

     Third-Party Plaintiff,

 v.

VISION LAND, LLC,

     Third-Party Defendant.

---

## ORDER ON SUMMARY JUDGMENT

---

  There will be no further fish fries on Center Street until someone pays to repair the collapsed floor at J&J Fish on Center Street, Inc. (J&J Fish). This lawsuit is an attempt to identify who should do so: (1) J&J Fish; (2) J&J Fish's insurer, Crum & Forster Specialty Insurance Company (Crum & Forster); or (3) J&J Fish's landlord, Vision Land, LLC (Vision). All parties have moved for summary judgment. J&J Fish requests partial summary judgment on the question of Crum & Forster's liability under the applicable insurance policy. (ECF No. 48.) Crum & Forster seeks a ruling that its policy does not cover the type of collapse at issue and, even if it is liable under the policy, it is entitled to subrogation against Vision. (ECF No. 43.) Vision asks the Court to dismiss Crum & Forster's subrogation claims. (ECF No. 40.) Because J&J Fish is entitled to coverage, its motion for partial summary judgment against Crum & Forster will be granted. Likewise, because Crum & Forster is entitled to subrogation as to any liability it may be assessed, its motion for summary judgment against Vision will also be granted. For the same reason, Vision's cross-motion will be denied. The case will proceed to trial only on the question of damages.

# FACTUAL BACKGROUND

Through a January 1, 2017 lease (the Lease), Vision agreed to rent a property located at 405 West Center Street in Milwaukee, Wisconsin (the Building) to J&J Fish. (ECF No. 42 at 1.) The Lease required Vision to:

> purchase and keep in full force and effect on the building(s) of which the Premises are a part insurance against fire and such other risks as may be included in all-risks policies of insurance in an amount sufficient to prevent [Vision] from becoming a co-insurer under the terms of the applicable policies.

(ECF No. 46-6 at 4.) It also required J&J Fish to maintain:

> Physical Damage Insurance, including but not limited to, fire, sprinkler leakage, vandalism and all other risks of direct physical loss as insured against under special broad form coverage endorsement for the full replacement cost of all additions, improvements (including leasehold improvements) and alterations to the Premises.

(*Id.*) Vision also accepted responsibility for "maintain[ing] and repair[ing] the structure including the slab floor and exterior walls of the Premises." (*Id.* at 5.) While Vision never obtained any insurance on the Building, (ECF No. 47 at 2), J&J Fish upheld its end of the bargain by purchasing a commercial property and casualty insurance policy (the Policy) from Crum & Forster. (ECF No. 50 at 7.) In fact, the Policy covered more than just "additions, improvements, . . . and alterations" as required by the Lease. Under the Policy's "Causes of Loss – Special Form," Crum & Forster agreed to insure the Building itself against "collapse," subject to certain exceptions. (ECF No. 47 at 5-8.)

Sometime between midnight and 10 a.m. on May 29, 2020, with the Crum & Forster Policy in effect, approximately 25% of the Building's slab floor (the section beneath the walk-in cooler) collapsed into the crawl space below. (ECF No. 47 at 3; ECF No. 50 at 5.) J&J Fish notified Crum & Forster of the incident, and the latter dispatched Dr. Daniel Wojnowski, an engineer and metallurgist, to investigate. (ECF No. 47 at 3.) Dr. Wojnowski inspected the crawl space and observed overall dampness as well as a pool of water at the south end. (*Id.*) He concluded that the collapse occurred because the steel support beams and steel elements of the floor corroded after prolonged exposure to moisture. (*Id.* at 4.) Based in part on his report, Crum & Forster denied coverage for the collapse loss on October 22, 2020. (ECF No. 50 at 13.)

# LEGAL STANDARD

"Summary Judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed.

R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

J&J Fish argues that what occurred at 405 West Center Street on May 29, 2020 qualifies as a "collapse" as defined by the Policy. Crum & Forster denies this, disclaims liability, and claims that even if the incident was a covered "collapse," Vision is the primarily responsible party and should be required to reimburse it for any amounts due J&J Fish as a matter of subrogation. Vision contends Crum & Forster is solely responsible for any liability.

**I.  J&J Fish Is Entitled to Summary Judgment on the Question of Liability Under the Policy.**

The interpretation of an insurance policy is a question of law for the Court to decide. *Fontana Builders, Inc. v. Assurance Co. of America*, 882 N.W.2d 398, 400 (Wis. 2016). The general rules of contract interpretation and construction apply. *See Advanced Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015). Thus, the words in an insurance policy must be given their plain and ordinary meaning. *See e.g., Preisler v. General Cas. Ins. Co.*, 857 N.W.2d 136 (Wis. 2014); *see also First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 976 (7th Cir. 2007) ("An insurance policy is construed to give effect to the intent of the parties as expressed in the language of the policy, which is interpreted as a reasonable person in the position of the insured would understand it.") (citations omitted). Further, policy language must be considered in context. *First Nat'l Bank of Manitowoc*, 485 F.3d at 976. And "[i]f the policy language is ambiguous, it is construed against the insurer and in favor of coverage." *Id.* (citations omitted).

A claim for benefits under an insurance policy gives rise to a shifting burden of proof. *Kozlik v. Gulf Ins. Co.*, 673 N.W.2d 343, 347 (Wis. Ct. App. 2003). The insured has the initial burden of proving that the loss falls within the grant of coverage and that the damages occurred during the policy period. *Id.*; *see Design Basics, LLC v. Campbellsport Bldg. Supply, Inc.*, 99 F. Supp. 3d 899, 911 (E.D. Wis. 2015) (citations omitted). If the insured makes a satisfactory showing, the burden then shifts to the insurer to prove that any exclusions apply. *Kozlik*, 673

N.W.2d at 347. "Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain." *Am. Fam. Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004) (citations omitted).

### A. J&J Fish Has Met Its Initial Burden of Establishing Coverage Under the Policy.

In the first instance, J&J Fish must show both that the loss it suffered fell within the Policy's coverage grant and that the damages occurred when that coverage was in effect. According to the Building and Personal Property Coverage Form, Crum & Forster "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (ECF No. 18-2 at 47.) "Covered Property" includes the Building. (*Id.*) Covered Causes of Loss are described on the Causes of Loss – Special Form. (*Id.* at 86.) Subsection B.2.k. of that form states: "We will not pay for loss or damage caused by or resulting from any of the following . . . Collapse, except as provided below in the Additional Coverage for Collapse." (*Id.* at 87-88.) Section D., the Additional Coverage for Collapse provision, reads:

1. With respect to buildings:
    a. Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purposes

(*Id.* at 91.) It then clarifies that:

  b. A building or any part of a building that is in danger of falling down or caving in is *not* considered to be in a state of collapse;
  c. A part of a building that is standing is *not* considered to be in a state of collapse even if it has separated from another part of the building;
  d. A building that is standing or any part of a building that is standing is *not* considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(*Id.*) (emphasis added). The next subsection explains that Crum & Forster will only pay for direct physical loss or damage if the collapse is caused by, as relevant here:

  b. Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse

(*Id.*) Taken as a whole, this means, to carry its initial burden, J&J Fish must show that its floor "collapsed" (as defined in Crum and Forster's insurance policy) as a result of "decay" that was both "hidden from view" and unknown to J&J Fish, and that this occurred at some point between October 3, 2019 and October 3, 2020 (when the policy was in effect). (ECF No. 47 at 5.)

The policy's definition of "collapse" turns on the meaning of: "abrupt," "falling down," and "caving in." When determining the plain and ordinary meaning of these terms, the Court may consult definitions in a recognized dictionary. *See Degenhardt-Wallace v. Hoskins, Kalnins, McNamara & Day, Ivars Kalnins*, 689 N.W.2d 911, 915 (Wis. Ct. App. 2004) (citation omitted). As relevant here, "abrupt" is an adjective that modifies "falling down" and "caving in" and means "characterized by or involving action or change without preparation or warning: sudden and unexpected." *Abrupt*, Merriam-Webster, https://www.merriam-webster.com/dictionary/abrupt (last visited September 12, 2022). "Fall down" is a verb meaning "to drop suddenly or collapse." *Fall down*, Dictionary.com, https://www.dictionary.com/browse/fall--down (last visited September 12, 2022). "Cave" is a verb that means "to cause to fall or collapse—usually used with *in*." *Cave*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cave (last visited September 12, 2022). Assembling the pieces, a "collapse" requires a sudden and unexpected drop or fall that renders at least part of a building unfit for its intended purpose.

Here, 25% of the Building's floor fell three-and-a-half feet into the crawl space overnight. (ECF No. 49 at 5.) This destroyed the walk-in cooler, leaving J&J Fish without a place to store its food and, therefore, unable to operate its restaurant as intended. (*Id.*) On its face, this was a sudden and unexpected fall or drop that rendered part of the Building unfit for use as a fish restaurant.

While Crum & Forster accepts these facts, it argues that they do not amount to a "collapse" under the Policy. It points to the limitations on the definition of "collapse" set forth in D.1.b.-d. The first of these limitations provides that a collapse does not include "[a] building or any part of a building that is in danger of falling down or caving in." (ECF No. 18-2 at 93.) This means that a building or part of a building that might fall, or even in all probability will fall in the future, is not in a state of collapse until that fall is realized. In other words, a structure like the Leaning Tower of Pisa is not in a "state of collapse." This provision may have described and applied to the restaurant floor *before* the May 29, 2020 incident, but it does not reflect the status of the slab floor *afterward*. The provision may also describe and apply today to parts of the building *other than* the slab floor. But the slab floor is plainly no longer "in danger of falling down"—that danger is long-passed; the floor has already fallen!

The second definitional limitation makes clear that "[a] part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building." This turns on the definition of "standing." To "stand" is "to maintain one's position."

*Stand*, Merriam-Webster, https://www.merriam-webster.com/dictionary/stand (last visited September 12, 2022). Presumably, then, a building that was vertically bisected such that its two newly formed sides remained upright but no longer touched would not be in a "state of collapse" under the policy. That is not what happened here. The slab floor did not maintain its position; it fell three-and-a-half feet.[1]

The final limitation reads: "A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." (ECF No. 18-2 at 91.) Much like the first exception, this means only that Crum & Forster is not liable for portions of the Building other than the slab floor because those parts remain "standing." For example, the policy would not cover a crack in an adjoining wall that occurred contemporaneously with the slab floor's collapse unless that wall also suddenly fell down—evidence of cracking will not suffice. But the slab floor does not show "evidence of cracking." It is not apparently "sagging." Nor does its current state portend the most violent "settling" a floor has ever experienced. It has already fallen. This exception does not apply to the collapsed slab floor.

Crum & Forster next seeks to get off the hook by arguing that the collapse was caused by decay that was not "hidden from view" under provision D.2.b. of the Policy. (ECF No. 56 at 8.) No one disputes that prolonged exposure to moisture caused the slab floor's steel support beams to decay, leading to the collapse. (*Id.*) But according to Crum & Forster, this decay was not "hidden from view" because it could be observed from within the crawl space, which was accessible via a hatch located outside the Building. (*Id.*) Indeed, as part of his inspection, Dr. Wojnowski, equipped with a flashlight, entered the crawl space on all fours and observed the decay. (ECF No. 50 at 11.) But the problem with Crum & Forster's argument is that "hidden" is a matter of degree. Under ordinary understanding, "hidden" means "being out of sight or not readily apparent." *Hidden*, Merriam-Webster, https://www.merriam-webster.com/dictionary/hidden (last visited September 12, 2022). That something can be seen when extraordinary efforts are employed does not mean that it is not hidden. In other words,

---

[1] Crum & Forster seeks to rely on an alleged "admission" by J&J Fish's Rule 30(b)(6) corporate designee, Hussain Ayad. (ECF No. 44 at 8-9.) In context, this testimony was not an admission. Counsel asked Ayad: "So the floor – so the floor was already separated at the time [you arrived for work]?" (ECF No. 46-4 at 27:7-8.) Ayad responded: "Yes. It was already down, yes." (*Id.* at 27:9.) Ayad did not even use the word "separated" and he distanced himself from it by intentionally rephrasing counsel's characterization of what occurred. Crum & Forster's argument is little more than a sly attempt to transform the colloquial use of a word into a binding admission.

something can be "visible" and also "hidden." Take the titular character of the *Where's Waldo?* series. He may not be invisible, but he is certainly hidden. Other courts have held similarly. *See Olde Colonial Vill. Condo. Council v. Millers Mut. Ins. Co.*, No. CIV.A.99C-06-187-FSS, 2002 WL 122885, at *9 (Del Super. Ct. Jan. 28, 2002) (unpublished) (holding that decay was "hidden" when the only way to see it "was to crawl into a narrow, unlit, unventilated, mud-floored crawlspace and shine a flashlight on the joists"). Under the plain meaning of the term, decay that was concealed within a cramped, unlit crawl space was "hidden from view."

In a last-ditch effort, Crum & Forster argues that J&J Fish cannot prove that the damage to the slab floor occurred during the relevant coverage period. The Policy provides: "We cover loss or damage commencing [d]uring the policy period shown in the Declarations." (ECF No. 18-2 at 86.) That policy period ran from October 3, 2019 to October 3, 2020, which includes May 29, 2020, the date the slab floor collapsed. (ECF No. 47 at 5.) But according to Dr. Wojnowski, based on the observable level of corrosion, the steel supports began decaying more than 10 years before the collapse occurred. (*Id.*) Crum & Forster seizes upon this opinion to argue that no "loss or damage" commenced during the policy period. But this conflates the corrosion of the steel beams with the collapse of the slab floor. An unhealthy diet can cause a heart attack, but the heart attack (and the corresponding bodily damage it causes) does not "commence" the first time a toddler places a french fry in his mouth. In this case, the relevant "damage" commenced on May 29, 2020, when the restaurant floor collapsed, taking part of the walk-in cooler with it. That occurred during the coverage period.

**B. The Exclusions Crum & Forster Cites Are Inapposite.**

Because J&J Fish has made a sufficient initial showing, to defeat coverage, the burden shifts to the insurer to prove that a policy exclusion applies. *Kozlik*, 673 N.W.2d at 347. Consistent with its "throw-everything-at-the-wall" approach, Crum & Forster invokes exclusions under three subsections (B.1., B.2., and B.3.). (ECF No. 56 at 21-22, 25-26.) These subsections are found in the Policy's Causes of Loss – Special Form, prior to section D., the "Additional Coverage for Collapse" provision on which J&J Fish relies for coverage. For purposes of this decision, what matters is how sections B. and D. interact. Because a reasonable insured would interpret the exclusions in Section B. as not applying to the subsequent additional Collapse coverage in Section D., none of the Section B. exclusions invoked by the insurer can upset J&J Fish's right to coverage.

Wisconsin courts apply a "traditional three-part inquiry [to] questions of insurance coverage." *Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819, 825 (Wis. 2012). They first look to the initial grant of coverage, then consider whether that coverage has been withdrawn by an exclusion, and finally, examine exceptions to the exclusion "that might reinstate coverage for the claim." *Id.* Crum & Forster's Causes of Loss – Special Form follows the same three-part trajectory. It opens with a broad grant of coverage in section A. (ECF No. 18-2 at 88.) That coverage is then winnowed via exclusions in section B. and limitations in section C. (*Id.* at 88-93.) Lastly, some exceptions to those exclusions are provided in sections D. through F. (*Id.* at 93-96.) Crucially, an exception to an exclusion in section D. cannot be ousted by the very exclusion it modifies. In other words, section B. cannot invalidate coverage granted in sections D. through F. because sections D. through F. are already exceptions to section B. Crum & Forster cannot, therefore, rely on exclusions listed under subsections B.1., B.2., and B.3. to undermine coverage granted to J&J Fish in section D.

To show the illogic of Crum & Forster's position, consider what would happen if the exclusions in subsection B.2. were applied to section D. Subsection B.2.d excludes coverage for "loss or damage caused by or resulting from . . . decay." (*Id.* at 89.) But, later in the same Policy, section D.2.b. provides that Crum & Forster *will pay* for physical loss or damages caused by a collapse if the collapse results from, for example: "Decay that is hidden from view." (*Id.* at 93.) If the exclusions contained in B.2.d. applied to section D., then an insured could never recover for collapse caused by decay because B.2.d. specifically excludes coverage for damage caused by "decay," whether hidden from view or not. (*Id.* at 89.) Insurance policies must be interpreted in context, and interpretations that create surplus language are disfavored. *First Nat'l Bank of Manitowoc*, 485 F.3d at 976. Crum & Forster's proposed reading of its policy would render all of D.2.b. superfluous. At best, the policy language is ambiguous, and ambiguous language "is construed against the insurer and in favor of coverage." *Id.* (citations omitted). Therefore, Crum & Forster cannot wield any of the section B. exclusions to oust coverage under section D., and J&J Fish is entitled to summary judgment on the question of liability. The case against Crum & Forster must proceed to trial solely on the question of damages.

**II.     Crum & Forster is Entitled to Subrogation Against Vision.**

The other half of this case concerns whether Crum & Forster is subrogated to all rights, remedies, and causes of action accruing to J&J Fish and against Vision pursuant to the lease

agreement. "Subrogation is an equitable remedy which operates when a victim of loss is entitled to recover from two sources, one of whom bears a primary legal responsibility." *Cunningham v. Metro. Life Ins. Co.*, 360 N.W.2d 33, 36 (Wis. 1985). "If the secondary source pays the obligation, it succeeds to the rights of the party it has paid, against the third party, who was the primarily responsible party." *Id.* (citing 1 G.E. Palmer, Law of Restitution section 1.5(b) (1978)). In the insurance context, this means the insurer has the right "to be put in the position of the insured in order to pursue recovery from third parties, legally responsible to the insured for a loss paid by the insurer to the insured." *Id.* (citing 16 G. Couch, Couch on Insurance 2d (Rev. ed.) section 61:1 (1983)). "The determinative question is whether [the insurer], by [paying out, consistent with its policy], paid a debt to [the insured], other than as a mere volunteer, which in equity and good conscience should have been satisfied by [another, primarily responsible party]." *Universal Forest Prods. Eastern Div., Inc. v. Morris Forest Prods., LLC*, 558 F. Supp. 2d 893, 903 (E.D. Wis. 2008) (citation omitted).

Vision offers two main arguments in support of its motion for summary judgment: (1) subrogation does not apply because Vision is not a tortfeasor or wrongdoer; and (2) even if subrogation does apply, Vision performed all of its duties under the lease agreement, so whatever liability Crum & Forster is assessed is its "fair share." (*See* ECF No. 64.) The first is a nonstarter. There is no rule that subrogation may only be had against a wrongdoer or tortfeasor. *Millers Nat'l Ins. Co. v. City of Milwaukee*, 516 N.W.2d 376, 380 (Wis. 1994). Rather, "the right to subrogation arises when a person other than a mere volunteer pays a debt which in equity and good conscience should be satisfied by another." *Id.* (internal quotations omitted).

Nonetheless, if Vision could demonstrate that J&J Fish has no right of recovery against it, then there would be no rights to be subrogated to Crum & Forster, and its motion would therefore fail. But in insisting that it has satisfied its own obligations to J&J Fish, Vision badly misreads the Lease. Vision points to Section 9, which requires J&J Fish to maintain insurance to "be used for the repair or replacement of the property insured" in the event of loss. (ECF No. 64 at 5.) Dusting its hands, Vision declares, "case closed;" because J&J Fish had a duty to maintain insurance, Vision had no duty to pay for damages associated with collapse, so there is nothing for Crum & Forster to subrogate to. But this is not what the Lease says. The property insurance that the tenant is required to maintain pursuant to Section 9 is limited to coverage of "additions, improvements (including leasehold improvements) and alterations to the Premises." (ECF No. 46-6 at 4.) It is

Vision, as landlord, that is responsible under Section 8 of the Lease, for purchasing and keeping "in full force and effect *on the building*(s) of which the Premises are a part insurance against fire and such other risks as may be included in all-risks policies of insurance." (*Id.*) (emphasis added). In other words, the Lease required Vision, not J&J Fish, to obtain insurance coverage for the building itself, of which the slab floor is a part. Vision admits it acquired no such coverage. (ECF No. 47 at 2.) Further, Section 13a. specifically required Vision to "maintain and repair the structure including the slab floor." (ECF No. 46-6 at 5.) Vision disputes that it assumed this responsibility because it "was not occupying the property" and the corroded steel beams were hidden from view. (ECF No. 51 at 10.) Neither of these is a reason to unwind the plain terms of the parties' duly struck bargain as memorialized in the Lease. Vision could have contracted around its obligation to maintain the floor while another party occupied the Building. It chose not to. Now it bears the consequences.

It is evident that Vision breached the Lease twice over, once when it failed to acquire property insurance, and again when it failed to maintain the slab floor. Equity and good conscience demand that it shoulder the responsibility for these shortcomings. Accordingly, Crum & Forster is entitled to recover from Vision any amounts Crum & Forster becomes obligated to pay to J&J Fish in connection with the slab floor's collapse. *Fischer v. Steffen*, 783 N.W.2d 889, 892 (Wis. Ct. App. 2010). Additionally, per Section 24 of the lease, Crum & Forster is entitled to "costs, charges and expenses, including fees of attorneys, agents and others retained" incurred while enforcing the Lease against Vision. (ECF No. 46-6 at 9.)

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff J&J Fish on Center Street, Inc.'s motion for partial summary judgment, ECF No. 48, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant/Third-Party Plaintiff Crum & Forster Specialty Insurance Company's motion for summary judgment, ECF No. 43 is **GRANTED in part** and **DENIED in part**. The motion is granted with respect to the subrogation claim against Third-Party Defendant Vision Land LLC. The motion is denied with respect to Plaintiff J&J Fish on Center Street, Inc.

**IT IS FURTHER ORDERED** that Third-Party Defendant Vision Land LLC's motion for summary judgment, ECF No. 40, is **DENIED**.

Dated at Milwaukee, Wisconsin on September 12, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge